Good morning, Your Honors. I'm Dan Miller, Miller-Barrandes, representing the appellant in this case. I thank you for the opportunity to be here today. The decedent in this case, his name is Ferdoon. He was shot and killed by Officer Browder, San Diego Police Department, in an avoidable shooting, a shooting that should not have happened. Just to start off, I want to focus on the most important factor, the grand factor, the immediate threat of serious harm to the officer or anyone else. What did the officer know when he pulled his patrol vehicle into that alley about your point? Yes, he had received a report that there was an individual that matched a similar description that had used a knife to threaten someone. Threatened to kill someone? Threatened someone, yes. And repeated the threat inside the bookstore? Yes. So that's what he knew driving up? Correct. And there was a report of a knife. It's important that Officer Browder never believed. He claims he believed that he saw what he believed was a knife, but never a gun. That's not part of this record. That was the threat, is it? He said he showed me a knife and said he was going to kill someone, right? Correct, yes. We don't have the actual radio call in the record, though, do we? There was a summary, but I didn't see a transcript of one. Did I miss anything? I believe it's just the summary. Okay. So in Hayes v. County of San Diego, that's 9th Circuit, 2013, there was a suspect, domestic disturbance, and there was a call where two officers entered. They said to the suspect, show us your hands. The hands were raised from about 6 to 8 feet away, and the suspect was then shot when it was revealed that he had a large knife and was moving towards the officers. So that case was not a summary judgment case. The important part was the deputy said, I thought that moving towards me, even with a large knife, that I felt that that was a threat, and the court said that's not enough. Possession of a deadly weapon is not dispositive, and the court held that a simple statement by the officer that he fears for his life is not enough absent objective factors to justify deadly force. In this case, you have Officer Browder saying that Ferdoon was aggressing him, and that subjective belief is not enough for summary judgment, especially here where you have watching the video, and undisputed the defendant's experts even agree that Ferdoon was walking at, they call it a relatively slow pace, below average, and by the end he had actually slowed down or even come close to stopping and turning away from Officer Browder before he was shot. Two witnesses to these events said that they heard the officer say, stop, drop it. Yes, Your Honor, that's correct. One of those witnesses, Alberto Caliendo, said that he heard the officer say that twice, two or three times, stop, drop it. That's correct, Your Honor. Officer Browder doesn't remember. Why would the officer say that? He doesn't remember giving any warnings. Another witness said he didn't hear anything. So there is a disputed factual issue over whether warnings were given. There's no dispute. Well, there's a third witness, Andrew Nelson, who saw Officer Browder hold up his hand like this, meaning stop. That's correct. So two witnesses say they heard, stop, drop it, stop, drop it, maybe more than once, when his hand is up. Right. That's correct. And no one heard ever, stop or I will shoot, stop or I will kill you, no warning of the use of deadly force. That's undisputed. It's also undisputed that no one heard Officer Browder identify himself as a police officer. But just to sort of set the stage a little bit, I mean, the officer arrives. There's been some discussion in the brief about, well, it was a misdemeanor call for someone with a knife. But to me, it's a heightened risk situation. It doesn't really matter if it's a misdemeanor or not. The officer is confronted with somebody that's acting in a dangerous way and threatening, potentially threatening people. I mean, the officer knows that sometimes people make false calls on 911 and they can't assume that everything is accurate. I understand that. But still, it was a heightened risk situation. The officer was confronted with. Right? I think that's right. What I want to focus on, I think it was the officer's obligation when he arrived at the scene to actually evaluate what happened when he got there. Because when he arrived, there was no crime being committed. No one was being threatened. What he witnessed was someone walking at a casual, slow pace down an alley and not doing anything to anyone. So I think that's the important focus here. But I agree and I understand Your Honor's statement about that. So the Longoria v. Penal County, that's Ninth Circuit 2017. And I just made a motion to Your Honors, and I know it was denied. I respect that. But I just would respectfully request that you do watch a portion of the video in this case. Oh, we've seen it. Oh, you have seen it. Sometimes. Okay. Thank you. Part of the record, we reviewed it, all of us. I'm sorry. We all reviewed it. Okay. Thank you. In Longoria, there was also a video. This was a different type of case. It was a traffic stop. The suspect led the police on a 70-minute chase, was resisting. But in that case, the summary judgment was also reversed because the officer testified that he saw what he perceived as a shooter's stance. The video, the court said that was not perceptible in the video. I think the same thing applies here. Officer Browder said he saw him aggressing him, focused on him. The video doesn't show that. And the expert witness testimony, even of the defendants, just said he was casually walking along. So I think that's significant here. In addition— Does it matter that the police officer was shown the videotape before he was questioned? Yes, it does. I believe it does because we think there's a material issue of fact as to Officer Browder's credibility and whether or not he actually perceived a knife or should have. So at the scene, before this five-day-later statement, he said, I didn't see. There's no weapon. There's a dispute about what that meant, but he said there's no weapon. Five days later is the next time he was interviewed. After being coached by his attorney, able to watch the video multiple times with his attorney, then he said he was aggressing me with a knife. So we think there's a factual issue there as well. We also put in expert testimony that officers are trained to ascertain the difference between a weapon and a non-weapon in the hands of a suspect. That was an issue in Longoria as well because the officer— there was a material issue of fact over whether it was reasonable for him to perceive that there was a weapon in the hand of the suspect. Turns out there wasn't. Just like this case, it was a blue pen. That's all hindsight. I mean, the officer, high-risk situation, somebody's coming down the alley. They've got something in their hand, whatever it might be. Even if it had been a knife, assuming it was a knife, would the officer have been justified in using deadly force in this case if it was indeed a knife? No. I believe that. I think there's two levels. There's a question of fact over whether it was reasonable to believe and perceive a knife there or whether he did, but assuming he did, I think the force was still unreasonable, even assuming he did perceive a knife. I think from that, from the distance he was, given that there was no objective threat whatsoever, no slicing, no stabbing, no moving the hand over the head, and the undisputed video evidence here is someone walking casually along in an alley, and then he actually slows down and turns away from the officer. I also think, given the video evidence, and if he did hear stop or drop it, which Justice Hawkins pointed out, then there's an argument and a material factual dispute over whether he was trying to comply. He was slowing down, turning, stopping at the very end right before he was shot, and that's the same as the Hayes case. In Longoria, at the end of the day, the court held that the video evidence alone raises material issues of fact as to the reasonableness of the officer's actions. I would say the same applies here. The video evidence doesn't show the officer extending his wrist 90 degrees in a stop motion, does it? That's correct. The video evidence does not show that. Glenn, and I would like to reserve two minutes for rebuttal if possible, Your Honors. Glenn v. Washington County, that was a beanbag case, less than deadly force. But that case, I think this is another important thing. The officer's guns were trained on the victim who was shot, the suspect. In this case, that's the same situation. The defense has raised a 21-foot rule. Officer Browder testified about the 21-foot rule, which is the suspect is within 21 feet. They can reach you, an officer, by sprinting. They can get there faster than the officer can unholster, remove the safety, raise, aim, shoot a gun. So in this case, the 21-foot rule has no applicability whatsoever. Officer Browder, during the entire encounter, had his gun already pointed, aimed, and ready to shoot. It only took a split second to pull the trigger. Also, you have to have a suspect who is sprinting. In this case, undisputed, he was walking at a below-average pace, never sped up. In fact, he actually slowed down and may have stopped and turned away from Officer Browder. Also important from Glenn, because we have that in this case too, there's expert testimony that the escalation to deadly force was unnecessary, too quick. We submitted expert testimony from Roger Clark, a prominent police practices expert, on this same issue, that this was an avoidable shooting for multiple reasons. There are obvious alternatives, including taking cover behind the car to give Officer Browder more of an opportunity to actually see whether this was a knife or not and evaluate the situation. There was the use of a taser. It was within 21 feet. There were no adverse weather conditions. So one more case, briefly, Ninth Circuit, George v. Morris, 2013. This was a case where the suspect had a gun pointed down, and the court said if the person is armed or reasonably suspected of being armed, a furtive movement, harrowing gesture, or serious verbal threat might create an immediate threat. Here we have none of those. No harrowing gesture, nothing. No serious verbal threat, let alone anything. It's undisputed. Ferdoon said nothing, didn't threaten Officer Browder in any way. And Officer Browder testified at the moment that he actually shot Ferdoon. He did not believe anyone else was in jeopardy. He only feared for his own safety. I think that's important here as well. On qualified immunity, I would submit this is a case where you just cannot shoot an unarmed suspect who poses no threat. That would be Tennessee Garner, among many other cases. If you get more specific, there is one case I'd like to point you to, which is Reed v. City Modesto, 2015, Eastern District, California case. It's in our papers. The suspect was told to drop the knife and refused. He moved his foot and was shot multiple times by an officer. Rule 50 motion was denied on qualified immunity. And the court there said there are multiple opinions issued before 2010 establishing that police officers may not use deadly force when faced with a person armed with a knife in similar situations. They go through many other cases from different circuits. The idea and the upshot of it is suspect, unless charging, threatening, slicing, stabbing, some actual threat when they have a knife, it should not be afforded qualified immunity. There can't just be—it's not enough that someone's just holding a knife. And that goes to Your Honor Pregerson's question about if he did have a knife, the force was still unreasonable here. Thank you, counsel. Thank you. My name is George Schaefer. I'm an assistant city attorney, and I represent the defendants below the appellees in this appeal. The trial court found that the officer did not commit a Fourth Amendment violation, Officer Browder, and had qualified immunity. The court could affirm that ruling. And in reviewing this case— Did the trial court inappropriately construe the facts in your client's favor? No. The material facts were not in dispute. Is there any more important material fact in this case than what Officer Browder perceived in the millisecond before he fired his service weapon? That's the heart and soul of the case, isn't it?  And in the walkthrough after the shooting, the investigative team asked your client whether he saw a weapon, and he said no. Actually, on that issue, and I'm citing to page 319 in the record of Browder's testimony and pages 439—I'm sorry, 437 and 438 of Investigator Hastings' testimony— Can you pull the mic down a little bit? No, we can't hear you, so you need to pull the mic a little bit closer. I'm sorry. Yes, thank you. They all confirmed in context, they were asking him when he was back at the scene three hours later when they were doing the walkthrough, were there any weapons found here? And that is explained in the record at page 319. So specifically, what he was asked was, did you see any weapons? And Browder responded, no. That's ER-408-829. Yes, but if you look at 319, which is what Browder testified to, he was asked there at the scene, did he see any weapons? And the two homicide investigators confirmed that on page 406 of Manny Del Rio's testimony, as well as 439, 438 of Michael Hastings' testimony, the other investigators, that that was the context in that conversation. Yet at his deposition, he said he thought that Mr. Nihad had a knife in his hand. He did. He actually testified that right before the shooting, it appeared to him that the knife was being pointed at him. The suspect was focusing in on him, and the expression of the suspect, unfortunately, the security camera doesn't show the face of Mr. Nihad. Are you asking us to resolve that factual dispute? I don't think there's a factual dispute there, it's just that there's nothing to contradict what the officer said as far as the expression of this menacing look of Mr. Nihad. So there's not a contradiction, there's just not a video recording of that. But no witness says there was a menacing look. The witnesses basically say he was, I'll paraphrase, shuffling down the alley. Well, actually, the military police officer, although he, those are my words, but essentially there's witnesses that say they didn't perceive any threat or any acceleration in his pace. The military police officer, he noticed this shiny object, the same metallic shiny object that Officer Browder saw. Why does that make a difference under Hayes? Pardon? Why does that make a difference under Hayes? I mean, let's assume he had a knife. It turns out it was a ballpoint pen, but let's assume he had a knife. If he's not threatening the officer, the officer doesn't have a right to shoot him. Well, the difference, we have the military police officer who's there, a witness, reaching the same conclusion that he has a weapon. That supports the notion that this was an objective analysis by the officer. Right, so again, I said hypothetically, let's assume he had a knife. Why would that make a difference in our analysis under Hayes? Well, Hayes can be distinguished on several grounds from what happened here, in addition to the fact that we have a very short timeline here. First of all, there was no command to stop in Hayes. Four seconds after the person that was shot raised their hands, they were shot. And the reason articulated in that case why that use of force was unreasonable is because there had been no crime by Hayes. Hayes was in his own home. He had not threatened anybody with a knife. He was six foot eight feet away. And then you had the testimony of the girlfriend in that case who said he appeared clueless when the deputies were confronting him. This is a very different situation. Why don't you think he appears clueless on the video? You would agree that he is shuffling along. He is not sprinting, right? Well, everybody agrees on that. True? That he's not sprinting. He's not even walking quickly. The expert in this case, just look at the video, forget the expert. Well, in terms of the measurements, determined he was going at a pace of two to three feet per second. This is a biomechanical expert. And he was within 15 feet to 17 feet at the time he was shot. What's very critical about this expert testimony is he said there was constant gait. But at the moment that Mr. Neha was shot is when he slowed down. But the reaction time would be such that the officer would not know at that very moment he slowed down. So he was going at a steady gait. Well, it looks like on the tape it does look like he stops and then turns slightly. Would you agree? He's got these bright lights in his face. He hears a stop. There's no stop or I'll shoot. It could be stop. What are you doing? Stop. Have you seen somebody? Stop. Are you intoxicated? It's not stop or I'll shoot. And, you know, part of it, when I looked at that videotape multiple times, it looks like the officer essentially shot from the hip. The single discharge, which in my experience is dealing with police cases, when there's that sort of threat, they're usually multiple shots. Or if it's very close, multiple shots. It almost looked to me like an inadvertent discharge because I don't see any aim. I just see pull and boom. And I'm not expecting the officer to be superhuman. I'm not being critical. In the abstract, it was a very stressful situation. But it almost seems consistent with me to have been a mistake. I'm sorry, the last part? To have been a mistake. Well, look at the context of how this occurred. Do you understand what I'm saying? There's no sort of the type of thing that you typically see. This person's a threat, multiple shots. Sort of a, you know, almost a no aim. All of a sudden there's this discharge. Do you see that? What I saw was, in terms of a timeline, you know, had this call to 911 at 12.06 a.m., the officer arriving at 12.10, and immediately confirming the suspect was the same one that described, the one that was threatening to kill people. I'm asking what you saw on the videotape in terms of my question to you. It appeared to me what the officer testified to, that he pulled his weapon and shot him. Yeah, but your client has never said this was an accident. No. No, he's testified. To the contrary, to the absolute contrary. He has testified. At least according to his deposition. Stepped outside my vehicle. I saw this guy advancing towards me in a menacing way. He had a knife. I fired. That's correct. Thinner body mass. That's what they're taught to do. And the officer thought he was coming forward to stab him, which is critical. That was what he reasonably perceived in this alley. But if you look at the tape, there are bystanders who are just standing there within about the same distance as the officer, looking pretty unconcerned about this guy. But what was their testimony? Their testimony was, like the military police officer, I thought it was a weapon. I thought it was a gun. He said it was a weapon, but they certainly weren't reacting to it as though there was a weapon they needed to get out of the scene. They're just kind of lounging around. Well, they're off to the background. I don't know specifically what they were doing. Well, they didn't seek shelter. You'll admit that. They didn't seek to evade. They didn't seek to avoid the scene. True? Well, everything happened so fast, that's correct. What about the argument that the expert on the plaintiff's side says, just tactically, this didn't make any sense, because the officer, in effect, had the ability to walk backwards and assess the situation or figure out what was going on, do something else. But he drove pretty much right at this person. And I don't mean at in a negative way. I mean just everything had to happen very quickly because of where the officer positioned the car. And I'm not faulting him for that. He wants to see what's going on. But once he sees this person sort of shuffling, using that phrase, it's just my phrase, but walking in a, one of the witnesses said, kind of almost like a drunken way, not ambling like a normal human being, shouldn't we defer to the experts and not try to substitute our own judgment for what an appropriate police response would be in terms of reasonable use of force when you're dealing with a tactical situation with a community in that neighborhood who might be mentally ill. It's late at night. There might be intoxicated people. There's a whole host of totality of the circumstances, issues that perhaps should come into play. Well, with respect to the expert, Mr. Clark, he did not estimate distance. He did not measure anything. He agreed that the suspect was probably 17 feet away from the officer. And he acknowledged that Mr. Nihat was moving when he was shot. And most importantly, he admitted that if a person has a knife and is 7 to 14 feet away, it is a dangerous situation. Does that mean you get to shoot everybody that has a knife? No, it does not. But in terms of the other expert here, the biomechanical expert, his estimate was at the pace that Mr. Nihat was going, he would have been at Officer Browder between 1.5 and 2 seconds, and there would not be enough time under that scenario to do anything else. Except get in the car? And as the officer explained, getting in the car, he was afraid that then he would be more susceptible to being stabbed. For his own safety, he made the choice to get out of the car. Well, why isn't there a factual question here? I guess we're here on an interlocutor appeal and summary judgment. And as I look at this, if you construe the facts in the light most favorable to your client, sure. But if you construe the facts in the light most favorable to the plaintiff, it appears that there's a factual question for the jury. Because of the timeline, it's not really clear there is a factual dispute. I mean, this all happened within 33 seconds when the officer arrived at the time he shot, and there was only 1.5 to 2 seconds left before the suspect would have been right there with what he thought was a knife. But you would agree if he stopped, if the suspect had actually stopped, that there would be no justification for the shooting. If he had complied with the officer's command and actually stopped, but he did not. Well, the tape would seem to indicate that he did stop. He stopped. He's ambling along, and then there's this pause, and then he turns to the right, and then he's shot. So, I mean, I'm not asking you to say that's the correct interpretation or not, but why isn't it a factual question for the jury to resolve? Because the biomechanical expert's testimony is uncontradicted that at that very moment when that— He could have, but I understand that testimony completely, that if he'd sprinted to the officer, then he would have covered the ground pretty quickly. But the contrary view, if it's true the facts in the light most favorable to the plaintiff, which we're obligated to this stage, is that he had actually come to a complete stop. But looking at that video, the last step, the expert says at that point, the reaction time would not have been enough for Browder to realize he had slowed down in that last step. Why is that a jury question? I mean, that's your expert's opinion. Why is that a jury question? Because there's nothing to dispute that in the record. Even Mr. Clark, you know, he did not take any measurements or dispute the speed or anything. Our expert testified, too. Really, this raises the Scott case, which says when you have these action circumstances where an officer's— and this is a hot call— who then expect the officer to use some less intrusive means, the ultimate result is you're expecting them to be superhuman. That's what the court opinion says. And the result of that is you're going to deter police from trying to protect themselves and the public, which is going to create a situation that is not a good situation because it would entangle the courts in second-guessing. And that's precisely what the appellants are asking this court to do, is to second-guess what an officer did in response to a call that a man was threatening others with a knife, had lunged at the clerk, and was in the alley threatening people with a knife. And he had to make a split-second decision when he saw this shiny object coming towards him that appeared to be a knife with this menacing look on the suspect's face that was pointed at the officer, and he chose to defend himself in this scenario. Thank you, counsel. Will you rebuttal? Thank you. I heard counsel say that he was threatening someone in the alley with a knife. That's not true. I think he was talking about the prior incident. The prior incident. Yes. The menacing look, I think it's important. Andre Nelson, this was the only witness who was behind Officer Browder and could actually was looking at Perdoon. He described him as non-aggressive. I think that's important, too. And he did only react, as the panel pointed out, when Browder drew his gun. That's when he became concerned. Before that, no one was concerned. It was interesting, Judge Pragerson referred to it, maybe it was an inadvertent discharge. I wondered about that, too, because right after the shot, he ran up to Perdoon and tried to help him. And it seemed like if you really thought there was a knife there, it might have been more careful. I think this goes to the credibility issue and what Justice Hawkins pointed out, that when he was asked were there any weapons, he said no. Five days later, watches video, meets with attorney, prepares, then aggressing me. Those are things we should be able to ask. Those are jury questions we should be able to test credibility. Thank you. I appreciate it. Thank you, counsel. Thank you both for your arguments this morning. The case just argued will be submitted for decision. And we'll be in recess for a few minutes, and we'll come back and take some questions from the students. All rise.
judges: Hawkins, Thomas, Pregerson